PROSKAUER ROSE LLP
Lloyd B. Chinn (LC-7953)
Thomas A. McKinney (TM-7798)
1585 Broadway
New York, New York 10036
(212) 969-3000
Attorneys for Defendants
Securities Industry Automation Corporation and Sector, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

NYENEIME IBOK,

               Plaintiff,

  against

SECURITIES INDUSTRY AUTOMATION
CORPORATION; and SECTOR, INC,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

05 Civ. 6584 (GBD)

**DEFENDANTS' STATEMENT PURSUANT TO LOCAL RULE 56.1**

**Organizational Structure of Respondents SIAC and Sector**

1.      Security Industry Automation Corporation ("SIAC") provides computer and communications systems support to the New York Stock Exchange, the American Stock Exchange and the securities industry nationwide.  (Simone Decl. ¶3).

2.      SIAC plans, develops, implements and manages a variety of automated information handling and communications systems that support order processing, securities trading and market data reporting for a broad range of securities.  (Id. at ¶4).

3.      SIAC also provides support for essential regulatory and administrative activities. (Id. at ¶5).

4.      SIAC did not employ Ibok.  (Simone Decl. ¶15).

5.      No employment decision challenged by Ibok was made by an individual employed by SIAC at the time he or she made the challenged decision.  (*See* Szczepanski Decl. ¶¶26,40,41).

6.      Sector, Inc. ("Sector"), a subsidiary of SIAC, is headquartered in Brooklyn. (Simone Decl. ¶6).

7.      Through Sector, SIAC offers certain of its computer and communications technology to corporate customers.  (Id. at ¶7).

8.      Sector provides these customers with a wide range of communications, networking and managed services, such as email archiving, outsourcing, facilities management, disaster recovery, e-solutions, network and data distribution services.  (Id. at ¶8).

**Ibok's Employment with Sector**

9.      Ibok applied for a Sector Technician III in Sector's Communication Operations ("Comm. Ops") Division.  (Ibok Tr. 21:7-17, 152:4-9, 158:18-21; Compl. ¶¶ 9, 14).

10.     On February 25, 2001, Sector hired Ibok as a Sector Technician III (Grade 6). (Compl. ¶14).

11.      Ibok's job with Sector was his first "real job," and he earned more money with Sector than he had earned in any prior position.  (Ibok Tr. 23:20-21, 25:14-17).

12.     As a Tech III, Ibok was responsible for addressing and resolving network and circuit outages, installing and testing new circuits, troubleshooting data and voice communication problems to minimize outages by Sector customers, rewiring equipment, monitoring and responding to circuit alarms and completing various short- and long-term projects. (Ibok Tr. 22:25-23:7, Ex. 34; Compl. ¶14).

13.     As of August 2004, the Comm. Ops Division had 18 employees and was headed by Vice President, Edward Szczepanski. (Simone Decl. ¶9).

14.     Ibok, five other Tech III's (all of whom were, as of 2004, Grade 6) and two engineers were employed in the Comm. Ops Division's New York office. (*Id.* at ¶16).

15.     Tech IIIs in New York reported to Richard Ward; a Senior Manager. (*Id.* at ¶12).

16.     Richard Ward reported Jeffrey Simone, a Director. (*Id.* at ¶12).

17.     Simone reported to Szczepanski. (Simone Decl ¶10).

**The Weekend Night Shift Is Created**

18.     Prior to 2002, Sector did not regularly schedule Tech III's to work at night during weekends. (Szczepanski Decl. ¶¶9, 10.)

19.     Although a Tech III covered the weekend day shifts on a rotating basis, Sector did not have any coverage for weekend nights. (*Id.*).

20.     In response to the demand of one of its largest clients, the Depository Trust & Clearing Corporation ("DTCC"), Sector reconfigured its weekend scheduling of Tech III's in October 2002. (*Id.* at ¶¶11,12).

21.     In October 2002, the Tech IIIs in the New York office were reorganized to provide technical support for Sector's customers 24 hours a day, seven days a week. (*Id.* at ¶13).

22.     As of October 2002, two technicians worked two, three-day weekend shifts: one on Friday, Saturday and Sunday from 8:00 a.m. to 8:00 p.m., the other from 8:00 p.m. to 8:00 a.m. (*Id.* at ¶14; Ex. 6).

23.     DTCC's business with Sector funded the creation of a weekend night shift and made it economically viable. (*Id.* at ¶15).

24. In October 2002, Sector offered the new weekend evening shift to Ibok. (Ibok Tr. 75:12-23; *See* Ex. 5; Simone Tr. 62:14-20).

25. When offered the weekend night shift in October 2002, Ibok "took" the new weekend evening shift. (Ibok Tr. 75:12-23).

**Ibok's Work Performance Problems**

26. Sector first addressed Ibok's interpersonal skills in 2002. (Nash Ex. A).

27. In April of 2002, Paul Nash, the then-Director of Operations (and an African-American), counseled Ibok in response to a complaint that Ibok was harassing one of his co-workers, Gina Ascione. (Nash Decl. ¶6).

28. Nash documented this verbal warning by memo dated April 29, 2002, writing that he told Ibok that "he must not at anytime attempt to or give any jester of intimidation to any of his co-workers" and "mentioned that he must be very careful about any sexual or ethnic statements of jokes." (Nash Ex. A; Nash Decl. ¶¶7,8).

29. Nash Exhibit A truthfully recounts what Nash was advised by Ms. Ascione. (Nash Decl. ¶8).

30. Nash Exhibit A truthfully recounts Nash's interactions with human resources personnel. (*Id.*).

31. Nash Exhibit A truthfully recounts what Nash said to Mr. Ibok. (*Id.*).

32. Nash Exhibit A truthfully recounts what Mr. Ibok said to Nash. (*Id.*).

33. Nash wrote Nash Exhibit A of his own free will and was not coerced or influenced in any way. (Nash Decl. ¶9)

34. In January 2004, Ibok received an overall rating of "performing" on his annual performance evaluation from Ward, his immediate supervisor. (Ex. 8).

35. Ward indicated that Ibok "rarely [met]" the performance standard relating to teamwork and only "occasionally [met]" the standard concerning providing co-workers with appropriate feedback. (Ex. 8 at p.4).

36. Ibok reviewed the evaluation, sent it back to his manager and did not quarrel with

this assessment.  (Ibok Tr. 200:14-204:24).

**The May 10, 2004 Warning**

37. On Saturday, April 17, 2004, Ibok informed Ascione, a Tech III who was taking over at 8:00 a.m. after Ibok's shift ended, that "one circuit was down" and she was to "look at it and update Jeff."  (Ibok Tr. 217:18-219:2; Ex. 9; Simone Tr. 100:23-101:12).

38. When Ibok made this statement, he knew there was no circuit down, and no need for Ascione to call her supervisor at 8:00 a.m. on Saturday morning.  (Ibok Tr. 221:4-7).

39. Ascione called Simone at home early that morning.  (*Id.* at 218:7-9, 229:7-15; Simone Tr. 100:23-101:12).

40. When Ascione called Simone, they determined that no circuits were down. (Simone Tr. 100:23-101:12).

41. When Simone spoke to Ibok about the alleged connection problem, Ibok confirmed that there had never been a problem and said that he had been playing a joke on Ascione.  (Ibok 222:18-223:6; Ex. 9; Simone Tr. 101:13-16).

42. Later that same weekend, on April 19, Ibok emailed Ascione and another technician, Ralph Maldonado ("Maldonado"), and copied two other technicians in the Comm. Ops Division's New York office.  (Ex. 5).

43. In the email, Ibok stated, ". . . ONE OF THE REASONS I TOOK THE WEEKEND SHIFT WAS BECAUSE I WOULD NOT HAVE TO WORK WITH EITHER OF YOU!!!!!!!!!  SO DO ME A FAVOR, STAY AWAY FROM ME!!!!!!!!!!! . . ." (*Id.*).

44. On April 26, 2004, Ward and Simone spoke with Ibok about his reporting of the customer outage and his email.  (Ibok Tr. 222:18-223:6).

45. At that meeting Ibok again said he made up the customer outage in order to play a joke on Ascione.  (Ibok Tr. 222:24-223:6).

46. Ibok stated that he wrote the inappropriate email because Ascione "made a big deal" out of his joke.  (*Id.* at 223:14-224:7).

47. During the April 26, 2004 meeting, Ibok said that he did not like Ascione and

Maldonado. (Ex. 9).

48. When asked if he was trying to cause problems for Ascione, Ibok stated that he was "taking the Fifth." (Ex. 9).

49. After Simone conferred with Szczepanski and human resources, he issued Ibok a Written Warning on May 10, 2004. (Simone Tr. 97:19-101:12; Ex. 9).

50. Ibok refused a request to acknowledge that he had received the warning. (Ex. 9; Ibok Tr. 221:4-223:6; Simone Tr. 93:16-94:19).

**The August 9, 2004 Warning**

51. On August 9, 2004, Ward issued Ibok a Final Written Warning. (Ex. 12).

52. The August 9, 2004 warning identified four incidents of poor performance: (1) failure to adequately monitor, resolve and/or communicate the fact that 12 Sector customers had outages during his shift on June 26, 2004; (2) failure to respond adequately to management's concerns about the customer outage situation; (3) failure to communicate with management concerning his vacation schedule; and (4) failure to communicate with management concerning software installation. *(Id.)*.

53. On June 26, 2004, Ibok did not create a work ticket or log an entry indicating that any of Sector's customers were having a problem with their circuits. (Ex. 14; Ibok Tr. 288:15-289:7, 499:18-504:24).

54. Dornell Wright ("Wright"), the Tech III who began work at 8:00 a.m., immediately after Ibok's shift ended, discovered that the circuits of 12 customers were not in operation. (Wright Decl. ¶¶3,4).

55. Sector investigated the outages. (Ex. 14)

56. Among other things, Simone spoke to Ibok and Wright and reviewed the Comm. Ops Division's logs and work tickets. (Ex. 14; Ibok Tr. 290:21-291:10; Wright Decl. ¶5).

57. Simone believed that although the outages had been visible to Ibok on the monitoring station in the Comm. Ops Division, he had failed to correct or report them in accordance with the Division's procedures. (Ex. 9 at p.2; Wright Decl. ¶¶6-9; Ibok Tr. 338:9-339:10).

58. When questioned, Ibok acknowledged that he had failed to open a work ticket or log entry concerning the outages. (*see* Exs. 9 at p. 2, 24; Ibok Tr. 477:22-479:24).

59. When asked if he advised Wright of the outages, Ibok stated "I think I did." (Ex. 24 at p. 2).

60. Wright is African-American. (Ibok Tr. 91:7-14).

61. Wright denied that Ibok reported the outages to him. (Wright Decl. ¶6; Wright Ex. A).

62. Wright reported that he did not become aware of the outages until after the shift change. (Wright ¶5).

63. Upon discovering the outages, Wright took steps to determine their cause and restore the customers' connections. (Wright Decl. ¶¶8,9; *see* Ex. 14 at p.5).

64. Ibok failed to reply an emails sent by Rich Ward to him on June 30, 2004, by July 6, 2004; an emails sent to him by Jeff Simone on June 22, June 28 and July 1, by August 9, 2004. (Ex. 12, 13; Ibok Tr. 297:17-306:7).

65. Ibok didn't respond to several voice mails left for him concerning his vacation requests. (*Id.*).

66. Ibok did not respond to Simone's request that he meet with him on July 19, 2004. (*Id.*).

67. Ibok failed to follow procedures to report his intention to miss work. (*Id.*).

68. On August 16, 2004, Ibok emailed Human Resources a "response" to the August 9, 2004 Final Written Warning. Nowhere in this response did he allege he was being retaliated or discriminated against. (Ex. 13).

69. Management in the Comm. Ops Division reviewed Ibok' assertions about the Final Written Warning and prepared a written response. (Ex. 14).

**Ibok's Insubordination**

70. Subsequent to issuing the Final Written Warning, on August 10, 2004, management sent to Ibok electronically his interim performance review, also known as a

HAID review.  (Ex. 16).

71.     Among other things, Ibok received an overall rating of "Under Performing," and it was noted that he had "consistently shown an inability to work with Operations team members and management," had a "negative attitude" that was affecting his work performance and had failed to comply with Sector procedures when dealing with customer outages.  (*Id*. at p.1).

72.     It was also noted that Ibok had received a verbal warning and two written warnings and that, rather than improving after the warnings, Ibok's performance had "deteriorated."  (*Id.* at p.7).

73.     Ibok refused requests on November 30 and December 1, 2004 from Simone that he acknowledge receiving the review.  (Ex. 17).

74.     Simone advised Ibok that he could note his disagreement with the review in the comments section of the document.  (Ibok Tr. 328:11-332-20; Ex. 17).

75.     Ibok's responses to Simone contained all capital letters and many exclamation points.  (Ex. 17).

76.     On December 3, 2004, Human Resources personnel, Szczepanski and Simone met with Ibok.  (Ibok Tr. 420:23-421:19; Ex. 23).

77.     The meeting started at 8:00 a.m. and before it started, Ibok let the participants know that he would leave at 9:00 a.m.  (Ex. 23 at p.1; Ibok Tr. 426:16-427:4).

78.     Ibok raised his voice several times during this meeting.  (Ex. 23 at p.1; *see* Ibok Tr. 427:23-428:3, 433:14-24).

79.     As Ibok prepared to leave before the meeting was over, he was told that the meeting was not over.  (Ex. 23 at p.2; Ibok Tr. 432:21-433:6).

80.     Ibok was warned that he would be placed on administrative leave if he left the meeting at that point.  (Ex. 23 at p.2; Ibok Tr. 432:21-433:6).

81.     When Ibok left the meeting, he was advised that he would be placed on an administrative leave for one week.  (Ibok Tr. 436:4:-437:16).

**Elimination of the Weekend Night Shift and Termination of Ibok's Employment**

82.  During the years following the October 2002 creation of the weekend night shift, Sector's services and customers underwent a number of changes. (Szczepanski Decl. ¶16).

83.  Among other things, Sector's revenues declined as customers began to rely on services provided by other vendors and/or their own internal departments. (*Id.* at ¶17).

84.  For example, in 2004, DTCC began the migration of its applications and customers to its own data center and network facilities. (*Id.* at ¶ 18).

85.  Because DTCC was in-sourcing the monitoring of its circuits (the work that Sector's Tech IIIs performed) the demand for Sector's services in this area declined. (*Id.* at ¶18).

86.  In connection with Szczepanski's ongoing review of the performance of the department, he monitored the volume of trouble tickets generated by customers. (*Id.* at ¶19).

87.  Szczepanski's analysis revealed that there were only five customer-generated trouble tickets for Ibok's shift in August 2004, three in September 2004, four in October 2004, and seven in November 2004. (Ex. 21; *See* Ex. 35).

88.  Szczepanski's examination of the volume of customer-generated "trouble tickets" on the weekend night shift over a period of four months revealed that the shift was unnecessary and financially unsupportable. (*Id.*).

89.  On average, the workload was fewer than one trouble ticket per weekend-night shift. (Ex. 21).

90.  Ibok engaged in personal activities while working his shift. (*See*, *e.g.*, Exs. 26,27,28, 29, 30, 31; Ibok Tr. 531:6-537:23, 550:19-557:10).

91.  As of 2004, Sector was supporting fewer circuits as a result of the introduction of a new and more reliable product, SIAC SFTI (pronounced "safety"). (Szczepanski Decl. ¶20).

92.  SFTI resulted in lower numbers of circuits being monitored by Sector because

instead of a client running multiple circuits directly to SIAC's data centers, users connect to two or more Access Centers directly via the telecommunications carrier of their choice, eliminating the need for Sector to monitor multiple circuits.  (*Id.* at ¶21).

93.     Between October 2002 and December 2004, the number of customers connecting to Sector's circuits, the number of connections that needed to be maintained and monitored by Sector's technicians, and the revenues generated from such activities, all decreased.  (*Id.* at ¶22).

94.     As of 2005, the volume of work for Tech IIIs was projected to continue declining as a result of the improving technology.  (*Id.* at ¶23).

95.     The Comm. Ops Division introduced remote access capabilities, which enabled technicians to access and manage the network and test customer connections from off-site and address off-hour, emergency situations from locations other than the New York office, including their homes.  (*Id.* at ¶24; *see* Ex. 22).

96.     In December 2004, Szczepanski decided to eliminate the weekend-night shift (Friday, Saturday, Sunday, 8:00 p.m. to 8:00 a.m.), effective February 1, 2005. (Szczepanski Decl. ¶25).

97.     Sector has not reinstated the weekend night shift since February 1, 2005.  (Simone Decl ¶19; Szczepanski Decl. ¶26).

98.     Sector has had further successive rounds of layoffs since January 2005 resulting in the elimination of numerous Tech III positions.  (Simone Decl. ¶25).

99.     After the elimination of the weekend-night shift, Sector utilized an on-call system for weekend nights.  (Simone Tr. 161:16-163:14).

100.    Sector paid one of the Tech IIIs (on a rotating basis) who worked during the week to be on-call for Saturday and Sunday night.  (*Id.*).

101.    In the event an issue arose, the Tech III was expected to try and troubleshoot the problem from their home computer by logging into Sector's network.  (*Id.*).

102.    The Tech III on call for Saturday and Sunday nights was paid $75 per day ($150 per weekend).  (*Id.*).

103.    Thus, Sector was able to provide customers the same level of support for only $7,800 per year.  (Simone Decl. ¶24).

104.    As of February 2005, $7,800 was less than one tenth of Ibok's salary (*Id.*)

105.    Upon the elimination of the weekend night shift, Sector did not offer Ibok the opportunity to transfer to another shift because, *inter alia,* he was an at-will employee with on-going performance problems, was currently on a Final Written Warning, had received an interim review of "Under Performing," had failed to improve his performance, had difficulties with his co-workers, had previously expressed a preference for working alone, and, finally, and perhaps most importantly, had been extraordinarily and repeatedly insubordinate with his management.  (Szczepanski Decl. at ¶40).

106.    Sector terminated Ibok's employment effective January 31, 2005.  (*Id.* at ¶41).

**Ibok's Complaints About Maldonado**

107.    On May 11, 2004, Ibok contacted the HR Help Desk to ask who he should contact to report a matter.  (Ex. 11; Ibok Tr. 247:11-250:10).

108.    Later that same week, on May 16, 2004, Ibok sent an email to SIAC's building operations from his home computer stating "I have a co-worker who steals the company's money.  (Ibok Tr. 247:11-250:10).  He puts in his time sheet that he works on the weekends but never does.  In fact he leaves 2 hours early every weekday.  Who do I complain to?" (Ibok Tr. 248:9-249:3).

109.    The May 16, 2004 e-mail is the first documented contact Ibok had with management concerning any complaint regarding Maldonado.  (Ex. 11).

110.    Ibok made no mention of his race, color or national origin in this May 16, 2004 e-mail.  (Ex. 11).

111.    In response to Ibok's report, Ronald Perone ("Perone"), a human resources representative, immediately commenced an extensive investigation.  (Ibok Tr. 358:3-360:23; Ex. 19).

112.    In addition to a review of time records, the investigation consisted of interviews with all of the Tech IIIs in New York, Ward and Simone.  (*Id.*; *see*, *e.g*, Ex. 7; Ward Tr.

63:23-65-21).

113.  On August 16, 2004, Ibok reported that he had been told by a co-worker that Maldonado said "if he gets fired because of the investigation, he would kill Ibok." (Ex. 20; Ibok Tr. 170:19-171:11).

114.  When Ibok reported this allegation to Perone, he made no claim that this allegation had anything to do with his race. (Ex. 20).

115.  Sector investigated this new assertion regarding Maldonado as well. (Ex. 19 at p.4).

116.  At the conclusion of the investigation, Sector determined that Maldonado had been leaving early and had falsified his time entries. (*Id*. at p.3).

117.  Sector determined that Maldonado had made an inappropriate threat against Ibok. (*Id.* at p.4).

118.  Sector terminated Maldonado's employment for cause, as of September 2004. (*Id.* at p. 4-5; *see also* Ibok Tr. 318:14-319:9).

119.  In addition, Ward was demoted from his supervisory role and issued a final written warning for, among other things, paying employees for time not worked. (Ward Tr. 66:11-15).

120.  Simone was issued a written warning for, among other things, ineffectively managing the time and labor process of his employees and directed to make changes in his supervision of the Comm. Ops Division. (Simone Tr. 74:9-15).

121.  On June 7, 2004 Ibok sent an e-mail to Perone but did not make any claim that he (or anyone else) had been discriminated against because of his race. (Ex. 10).

122.  Ibok's June 7, 2004 e-mail to Perone compared Maldonado's conduct to that of two individuals assigned to Sector's help desk by a temporary staffing agency, Angela [Johnson] and Shauna [Littlejohn]. (*Id.*)

123.  Sector terminated Littlejohn and Johnson's temporary services for falsifying their time entries. (*Id.*; *See* Ex. 32; Ibok Tr. 598:20-603:14).

124.  Johnson and Littlejohn's timesheets (Ex. 32) were altered after being submitted to

Sector to reflect more hours than actually worked. (Ibok Tr. 598:20-603:14).

125. Ibok's June 7 e-mail also included a number of allegations of inappropriate comments that Maldonado had made about various white males. (Ex. 10).

126. On August 23, 2004, Ibok sent Perone an email concerning his performance review in which Ibok mentioned race discrimination. (Ex. 18).

127. Ibok's accusations were investigated by Perone and found to be without merit. (Szczepanski Decl. ¶39).

128. It is undisputed that Sector's Vice President of Comm. Ops, Edward Szczepanski, eliminated Ibok's shift, the weekend-night shift, because the volume of customer issues made maintaining the shift financially imprudent, and technology was destined to make it even more so. (Szczepanski Decl. ¶¶16-26;41).

129. Szczepanski was the primary decision-maker behind Ibok's termination. (Decl. Szczepanski ¶ 40).

130. Mr. Szczepanski never said anything to Ibok about his race, color or national origin. (Ibok Tr. 165:14-17).

131. Ibok had no interest in living in Chicago. (Ibok Tr. at 155:8-14, 163:23-164:2).

132. The tension between Ibok and Maldonado stemmed from Maldonado's jealousy regarding Ibok garnering the interest of a female co-worker. (Compl. ¶31; Ibok Tr. 61:9-63:8).

133. Maldonado's threat against Ibok did not mention Ibok's race. (Exs. 19,22).

134. Ibok and Maldonado's time in the office barely overlapped. (Ex. 19).

135. Maldonado was a fellow Sector Tech III like Ibok who did not supervise Ibok.

136. Maldonado did not have the authority to make personnel decisions. (Ibok Tr. 308:9-309:10)

137. Maldonado did not have the authority to issue discipline, grant promotions, or evaluate performance. (*Id.*)

138. Maldonado did not direct Ibok's work activities (*Id*. at 319:25-326:20).

139. Ibok worked the weekend night shift by himself, without any direct supervision, from 2002 until the shift was eliminated in 2005.

140. At no time did Ibok hear Simone make any derogatory comment about Ibok's race. (Ibok Tr. 355:6-356:16).

141. Other than the monitoring Simone did by telephone, and the occasional visit, Ibok was free to supervise his own activities. (Simone Tr. 30:4-31:3).

142. Simone and Maldonado were co-workers before Simone was promoted. (Ibok Tr. 346:13-347:7, 350:16-352:23; Ibok Ex. 20; Compl. ¶36; *but see* Compl. ¶19).

143. The first time Ibok made any claim of race discrimination was in his August 23, 2004 response to his August 10 warning. (Ex. 18).

144. Sector eliminated Ibok's shift and terminated his employment more than five months after his email to Perone complaining of race discrimination. (Ibok Ex 20).

Dated: April 23, 2007

                                                    Respectfully submitted,

                                                   PROSKAUER ROSE LLP

                                                   By:   /s/ Lloyd B. Chinn
                                                       Lloyd B. Chinn (LC-7953)
                                                       Thomas A. McKinney (TM-7798)
                                                 1585 Broadway
                                                 New York, New York 10036
                                                 (212) 969-3000
                                                 *Attorneys for Defendants Sector,*
                                                 *Inc., and Securities Industry*
                                                 *Automation Corporation*