UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

NYENEIME IBOK,  :

                     Plaintiff,  :

                                                                :      **MEMORANDUM DECISION**
                                                                   :            **AND ORDER**

           - against -  :      05-cv-6584 (GBD)

                                                  :

SECURITIES INDUSTRY AUTOMATION CORP. AND  :
SECTOR, INC.,  :

                     Defendants.  :

------------------------------------------------------------------ x

GEORGE B. DANIELS, UNITED STATES DISTRICT JUDGE:

      Plaintiff Nyeneume Ibok brings this action against his former employer, Sector, Inc. and its parent company, Security Industry Automation Corporation ("SIAC"), alleging that he suffered racial and nation origin discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2003 *et seq.*, the Civil Rights Act of 1991 ("Title VII") and the New York City Human Rights Law, Administrative Code §§ 8-101 *et seq.* (2007) (the "HR Code"). Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## MATERIAL FACTS AND PROCEDURAL HISTORY

      From February 2001 through January 2005, plaintiff, a Nigerian-born African-American, was employed by defendant Sector, Inc., a subsidiary of defendant SIAC that provides computer and communications systems support to entities within the securities industry. See Declaration of Antonia Kousoulas ("Kousoulas Decl."), Ex. A, Affidavit of Nyeneime Ibok filed July 10,

2007 ("Ibok Aff.") ¶¶ 2, 4, 28; Plaintiff's Counterstatement Pursuant to Local Civil Rule 56.1 ("Ctrstmt.") ¶ 1. Plaintiff worked with approximately five to seven other technicians in Sector's New York office. Ctrstmt. ¶ 14. One other technician in plaintiff's work group was African-American. Simone Depo. Tr. at 56; Defendants' Statement of Material Facts ("Def. Stmt.") ¶ 60. One of plaintiff's initial supervisors was also African-American.

Plaintiff testified that when he inquired about the possibility of being promoted to a supervisory position, his second-level supervisor replied, "I can't promote people like you." Ibok Depo. Tr. 143:15-24. Plaintiff interpreted the phrase "people like you" to refer to his race and national origin. See Ibok Depo. Tr. at 146.

One of plaintiff's non-African-American coworkers allegedly made several patently offensive statements. Plaintiff testified that this coworker directed lewd and sexually demeaning remarks towards a white, female technician and complained that she did not complete her share of the work. See id. at 86, 265. Plaintiff claims that this coworker made manifestly offensive comments on approximately three occasions between 2002 and 2003, some of which disparaged African-Americans. Id. at 193. According to plaintiff's deposition testimony, that coworker told plaintiff, "The two Africans, those people are lazy." Id. at 198:8-18. Plaintiff explained that the "two Africans" referred to two African-American customer representatives who worked at Sector. Id. Plaintiff also testified that the coworker said, "[A] lot of Black people don't do much or are lazy, complaining a lot." Id. at 193:13-23. This coworker's comments about fellow employees led plaintiff to believe that other persons at Sector were racially bigoted. The coworker advised plaintiff that a fellow employee refused to "take any instructions from a Black man." Id. at 195:4-9. According to plaintiff, the coworker opined that plaintiff's second-level

supervisor was a racist and admonished plaintiff that plaintiff would never "get anywhere in the company, because [he was] not White." Id. at 144:3-7. Plaintiff testified the coworker warned, "It's hard to get up in the company, if you are not like, Italian, Irish or something." Id. at 186:11-18.

Plaintiff complained about this coworker to his direct supervisor in 2002. Plaintiff's 2002 complaint concerned two issues: that coworker's sexually demeaning statements directed at a white, female employee and plaintiff's perception that the coworker was involved in a romantic relationship with another female employee. Id. at 86. In October 2002, plaintiff complained to his direct supervisor that the coworker, "among other things, had been leaving his shift early and leaving work" for plaintiff to complete. Ibok Aff. ¶12. Plaintiff proffers no specific evidence that he complained of unlawful discrimination in 2002.

The record does, however, show that in 2002, the female employee that plaintiff alleged was romantically involved with his coworker lodged a complaint with plaintiff's African-American supervisor. A memorandum dated April 29, 2002 describes that female employee's complaints about her "poor working relationship" with plaintiff and her perception that plaintiff sought to intimidate her. Nash Declaration, Ex. A. Her complaints were relayed to Sector's Employee Relationship and Human Resources Departments. On April 29, 2002, a meeting was convened with plaintiff and his direct supervisors to address the issues the female employee had voiced. Id. During that meeting, plaintiff indicated that he and the female employee had a "personality problem". Id. Plaintiff was cautioned "that he must be very careful about any sexual or ethnic statements or jokes made that can be [misinterpreted] or offensive to co-workers." Id. It was also recommended that plaintiff enroll the Sexual Harassment course

offered by SIAC.  Id.

Although plaintiff initially received favorable performance reviews[1], his evaluations became more negative over time.  Plaintiff's January 2004 performance report, for instance, indicated that he "rarely [met] the performance standard relating to teamwork and only occasionally met the standard for assessing whether he provided his co-workers with necessary feedback."  Declaration of Lloyd B. Chinn ("Chinn Decl."), Ex. 8 at 4.  A series of incidents occurred after that evaluation that resulted in plaintiff receiving written warnings from his supervisors.

On April 26, 2004, plaintiff's supervisors convened a disciplinary meeting with plaintiff to discuss a false communication he had made the previous week and an email that he sent to two other employees.  Ctrstmt. ¶ 4.  It was concluded that, as a result of plaintiff's conduct and plaintiff's responses at that meeting, plaintiff would be placed on "corrective action."  Chinn Decl. Ex. 9.  Plaintiff refused to sign the written warning even though it was presented and explained to him.  Id.

On June 7, 2004, plaintiff emailed SIAC's human resources department complaining that the same coworker about whom plaintiff had previously complained was "given an better raise than everybody else."  Kousoulas Decl., Ex. 12.  Plaintiff testified that he "received a substantially lower salary increase than [his] non-black colleague."  Ibok Aff. at ¶ 18.  However, the record shows that plaintiff received bonuses in 2003 and 2004 equaling those Sector paid to white technicians other than the coworker about whom plaintiff had previously complained.  See

---

[1] See, e.g., Kousoulas Decl., Ex. E(2) at 2 (July 24, 2001 performance review giving plaintiff a "6" on overall scale of 1 - 7); id., Ex. G (February 24, 2003 performance evaluation rating plaintiff as "satisfactory" or "superior" on key job criteria).

Kousoulas Decl. Ex. W.  Although plaintiff's testimony characterizes that coworker as his "non-black colleague," no other evidence in the record suggests that plaintiff's June 7, 2004 complaint about that coworker's bonus referenced the coworker's race or identified any acts of unlawful discrimination committed by Sector employees.

Plaintiff received a second written warning dated July 21, 2004 that described several occasions on which he had "disregarded directions from his immediate Manager and Director of Operations."  Kousoulas Decl., Ex. HH.  Although plaintiff generally denies the facts set forth in the second warning, plaintiff's version of what transpired does not materially contradict defendants' descriptions of those same events.

Plaintiff received a final written warning dated August 9, 2004.  Chinn Decl., Ex. 12. That warning stated that plaintiff had "continued to exhibit inappropriate behavior following the last written warning on May 10, 2004."  Id.  As evidence of plaintiff's continued misconduct, the warning cited four incidents which occurred in June and July 2004, and which were referenced in the previously issued second written warning.

One of plaintiff's supervisors testified that between August 8, 2004 and December 2004, plaintiff engaged in "[a] lot of insubordination via a lot of emails."  Simone Depo. Tr. 139:12-25. Plaintiff's final performance evaluation (the "HAID review") noted that plaintiff had "consistently shown an inability to work with Operations team members and management," and that plaintiff displayed a "negative attitude" which had a detrimental impact on his job performance.  Chinn Decl. Ex. 16.  The evaluation further stated that plaintiff failed to comply with certain workplace procedures.  Id.  Although plaintiff received a copy of the HAID review, he refused to comply with the company's administrative procedures which required him to sign

and return the review to human resources. Plaintiff claimed that his review was "discriminatory". Ctrstmt. ¶ 73. Plaintiff raised his voice in anger at a meeting with plaintiff's supervisors to discuss his responses to the HAID review. See Ibok Depo. Tr. at 427. Plaintiff left that meeting prematurely even though he was advised that doing so would result in his being placed on administrative leave without pay. Id. at 438.

Plaintiff contends that the written warnings and unfavorable HAID review he received reflected a pattern of discriminatory treatment by Sector. Plaintiff also maintains that his supervisors punished him, and other African-American employees, for violating workplace procedures and other infractions, while white employees "were doing worse" with impunity. See, e.g., id. at 240, 264.

Plaintiff argues that Sector's discriminatory practices resulted in a failure to promote African-Americans. However, the record shows that no technicians at plaintiff's level in the New York office were promoted to some other position during plaintiff's tenure. Id. at 155. Only a white technician from Sector's Chicago office, was promoted from the position of technician to supervisor. Ibok. Aff. ¶ 20; Simone Depo. Tr. at 57, 58. Plaintiff concedes that did not apply for the Chicago supervisory position to which the white employee was promoted. Ibok Aff. ¶ 20.

Plaintiff points to several actions and communications which he maintains constitute "protected activity" under Title VII. Pl. Opp. Memo. at 8-9. Plaintiff counts as part of that activity his April 26, 2004 meeting to addresses the conduct underlying his first written warning. Plaintiff testified that he told his supervisors that their response to his "joking" conduct was "very trivial and discriminatory, and retaliatory, too" because other technicians "used profanities, [and] nobody was given a warning." Ibok Depo. Tr. 238:10-25. No other evidence in the record

supports plaintiff's contention that his comments during that meeting addressed any racial discrimination concerns.

Plaintiff also argues that his protected activity includes his communication with SIAC's human resources department prior to May 11, 2004 "about a range of things," including his feeling that he was being "discriminated against" since he "wasn't getting anywhere in the company like white employees." Id. at 252:13-25; see also Pl. Opp. Mem. at 4. Plaintiff believes that his protected activity also includes numerous other communications with SIAC's human resources department. See Pl. Opp. Memo. at 8.

Nevertheless, plaintiff did not complain that he suffered racial discrimination until August 23, 2004. Plaintiff presents no specific evidence of any complaint made in early April 2004. Ibok Depo. Tr. at 255. In his August 23, 2004 email, plaintiff informed SIAC's human resources administrators that he "totally disagree[d]" with his H.A.I.D. review. He further alleged:

> [My supervisors] are discriminating against me because of my race. I am the only [S]ector technician with a master's degree, CCNA and CCNP certifications, I have trained so [many] technicians on the latest technologies. Yet [I] get the worse raises, no promotion, no opportunity to grow.... [The coworker about whom I previously complained] has not even gotten a warning. Meanwhile last December[,]... two African-Americans in operations were fired for filling in their timesheets erroneously.

Chinn Decl. Ex. 18 at 1; see also Ward Depo. Tr. at 66; Simone Depo. Tr. at 74. Plaintiff's "Follow Up" email dated August 25, 2004 makes no reference to discrimination of any kind.

Sector advised Plaintiff that it would terminate his employment as of January 31, 2005 since it planned to eliminate plaintiff's weekend evening shift. Kousoulas Decl., Ex. J at 1. Plaintiff posits that defendants' "business justification" for his termination was merely a pretext

for its discriminatory and retaliatory decision to fire him. Pl. Opp. Memo. at 9. In support of this proposition, plaintiff argues that defendants' statistics describing their business justification for eliminating the shift do not accurately convey the volume and nature of the work that he performed during his shift. Ctrstmt. ¶¶ 82-89; see also Simone Depo. Tr. at 150 - 152 (conceding that defendants' statistics do not include incident reports for all hours that plaintiff worked but only the Saturday and Sunday shifts).

Since plaintiff's termination, no Sector technician has been assigned to work plaintiff's weekend night shift. Simone Decl. ¶ 19; Szczepanski Decl. ¶ 25; Simone Depo. Tr. at 159. A number of other persons within plaintiff's department were laid off in 2005. Simone Depo. Tr. at 177. Defendants also submitted termination records showing that eight other Sector employees lost their jobs in 2005 due to a "[r]eduction in force." See Supplemental Declaration of Lloyd B. Chinn, Esq., Ex. 39. By the beginning of 2006, Sector's gross revenues had declined approximately 25% from 2003. Kousoulas Decl. Ex. Z.

On March 15, 2005, plaintiff filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"). The EEOC issued plaintiff a Notice of Rights to Sue letter dated May 31, 2005. Plaintiff commenced this action on July 20, 2005. After this Court issued an opinion and order dated February 9, 2006 dismissing plaintiff's claims against certain individual defendants, plaintiff filed an amended complaint dated May 17, 2006. Defendants move for summary judgment on all of plaintiff's claims.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(b) of the Federal Rules of Civil Procedure, a party may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim. Fed. R.

Civ. P. 56(b).  "[I]n assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994).  This Court must deny a motion for summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 465 (2d Cir. 2001).

To decide whether to grant summary judgment in defendants' favor, this Court must undertake the three part analysis set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973); see also Brennan v. Metro. Opera Assn., Inc., 192 F.3d 310, 316 (2d Cir. 1999).  Applying McDonnell Douglas, plaintiff must establish a *prima facie* case of discrimination "by showing: (1) that he is a member of a protected class; (2) that he was qualified for the employment position in dispute; (3) that he experienced an adverse employment action; and (4) [...] circumstances giving rise to an inference of discrimination." Id. The burden on plaintiff at the initial stage of the analysis is *de minimis*. Id. at 317.  However, an employer may rebut a *prima facie* discrimination claim by presenting "reasons that, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." Abdu-Brisson, 239 F.3d at 469 (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509, 113 S.Ct. 2742 (1993).  Following such a rebuttal, a plaintiff must "come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory." Id.  Otherwise, his or her claims will be dismissed.

In evaluating whether the parties have met their respective burdens, this Court "examine[s] the record as a whole, just as a jury would, to determine whether a jury could

reasonably find an invidious discriminatory purpose on the part of an employer." Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, 102 (2d Cir. 2001). If the employer's explanation for the adverse employment action is: 1) "offered in clear and specific terms"; and 2) "is reasonably attributable to an honest even though partially subjective evaluation of qualifications," this Court will not draw an inference of unlawful discrimination. Id. at 104.

### RACIAL DISCRIMINATION

Plaintiff's *prima facie* case of racial discrimination under Title VII must be supported by admissible evidence showing that he is a member of a protected class; that he was qualified to hold his Technician III position at Sector, and that he experienced an adverse employment action under "circumstances giving rise to an inference of discrimination." Brennan, 192 F.3d at 316. The parties do not dispute that plaintiff is a member of a class protected under 42 U.S.C. § 2000e(a) or that plaintiff was qualified for his position at Sector. Termination clearly qualifies as an "adverse employment action." See Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir. 2008). The determinative issue, therefore, is whether plaintiff has made a *prima facie* showing that the events surrounding his termination give rise to an inference of discrimination.

Among the circumstances that may support an inference of discrimination are: an employer's acceptance of applications "from persons of the plaintiff's qualifications" after plaintiff's discharge; "the employer's criticism of the plaintiff's performance in ethnically degrading terms"; "invidious comments about others in the employee's protected group"; and "the more favorable treatment of employees not in the protected group." See Chambers, 43 F.3d at 37; see also Chertkova v. CT Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996) (evidence of "actions or remarks made by decision-makers that could be viewed as reflecting discriminatory

animus" may create an inference of discrimination).

A plaintiff seeking to show preferential treatment of non-protected employees must proffer record evidence of specific examples of discrimination as well as proof that the preferred employees were "similarly situated." See Simpson v. N.Y. State Dep't of Civ. Svcs., 166 Fed. Appx. 499, 501(2d Cir. 2006); Butler v. Raytel Med. Corp., 150 Fed. Appx. 44, 47 (2d Cir. 2005). This Court must evaluate the evidence of the employees' conduct and their respective employment positions to determine whether the groups are, in fact, similarly situated. See Hargett v. Nat'l. Westminster Bank, U.S.A., 78 F.3d 836, 839-40 (2d Cir. 1996) (noting that employees "occupying different levels of authority" may not be similarly situated despite engaging in similar conduct). Furthermore, when the record shows that non-protected employees engage in conduct "materially different" than that of plaintiff, those employees will not be considered similarly situated for purposes of inferring discrimination. See Billue v. Praxair, Inc., No. 07 civ 2359, 2008 WL 4950991, at * 1 (2d Cir. Nov. 20, 2008).

In addition to his Title VII claims, plaintiff alleges discriminatory violations of the New York City Human Rights Law, Administrative Code §§ 8-101 *et seq*. (2007) (the "HR Code"). The HR Code's "uniquely broad and remedial purposes ... go beyond those of counterpoint State or federal civil rights laws." Williams v. N. Y. C. Housing Auth., 872 N.Y.S.2d 27, 31, 2009 WL 173522, at * 3 (N. Y. App. Div. Jan. 27, 2009). Accordingly, in determining whether plaintiff's claims survive summary judgment, this Court must conduct an independent analysis under the HR Code.

Section 8-107 of the HR Code prohibits employers from refusing to hire, terminating or discriminating against employees "because of the actual or perceived age, race, creed, color,

national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status." HR Code § 8-107.  Under the HR Code, no "type of challenged conduct [may] be categorically rejected as nonactionable." Williams, 872 N.Y.S.2d at 33, 2009 WL 173522, at * 4.  Still, a plaintiff asserting claims under the HR Code must demonstrate "by a preponderance of the evidence that she has been treated less well than other employees" due to unlawful discrimination. Id. at 8.

In this action, plaintiff offers insufficient evidence of actions or remarks made by decision-makers reflecting discriminatory animus to support his claims.  The thrust of plaintiff's argument is that the coworker about whom he complained received favorable treatment notwithstanding violations of company policy; while, in contrast, plaintiff was terminated for committing relatively minor infractions.  Plaintiff also points out that two African-American customer service representatives were fired after breaking rules which, plaintiff argues, this coworker breached with impunity.  Plaintiff's analysis is fatally flawed in several respects.

First, plaintiff has not identified a group of non-protected class employees with whom he was similarly situated.  Plaintiff focuses almost exclusively on his supervisors' treatment of his one coworker.  See, e.g., Kousoulas Decl., Ex. 12 .  Plaintiff's effort to use this single coworker as a proxy for all white Sector employees, and himself as an example of Sector's disparate mistreatment of African-Americans, is not supported by the record.

The evidence demonstrates that this coworker received higher raises and other preferred treatment than other white technicians.  See Kousoulas Decl., Ex. 12; Ex. W.  Moreover, the other African-American technician in plaintiff's work group received a 2005 bonus which exceeded what Sector paid to several white technicians.  See id.  Thus, plaintiff has not shown

-12-

that similarly situated employees were accorded preferential treatment. Plaintiff's more general statements about other employees "getting away with [conduct] worse" than his own[2] are entirely conclusory in nature and cannot give rise to an inference of discrimination. See Gill v. Mount Sinai Hosp., 160 Fed. Appx. 43, 44 (2d Cir. 2005); Butler, 150 Fed. Appx. at 47.

### FAILURE TO PROMOTE UNDER TITLE VII

To assert a failure to promote claim under Title VII, a plaintiff must demonstrate that he is a member of a protected class, that on a specific occasion he "applied and was qualified for a job for which the employer was seeking applicants" only to be "rejected for the position" even though "the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998). If a plaintiff fails to demonstrate "that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion," his or her failure to promote claim will be dismissed. See Gupta v. New York City School Const. Authority, No. 07 civ 2991, 2008 WL 5273120, at * 2 (2d Cir. Dec. 19, 2008) (citing Brown, 163 F.3d at 710).

Plaintiff admits that he did not apply for promotion to any specific supervisory position within Sector. Ibok Aff. ¶ 20. The record further shows that, during plaintiff's tenure, no technicians at plaintiff's level in the New York office were promoted to some other position. Ibok Depo. Tr. 155. Accordingly, plaintiff has not presented facts to establish a *prima facie*

---

[2] See, e.g., Ibok Depo. Tr. 284:6-15 (plaintiff testified that a white, female coworker "sent out a router without configuring it and she wasn't disciplined", but plaintiff thinks that he "would have been fired or given a warning"); see also Ibok. Aff. ¶ 24 (claim that plaintiff received a warning on April 26, 2004 "for a matter that would have otherwise been overlooked by management" if it had involved an employee other than plaintiff); Ibok Depo. 240:17-24 ("Other employees were doing worse").

violation of Title VII for discriminatory failure to promote.

### RETALIATION

Title VII makes it unlawful for an employer to take adverse employment actions against an employee because 1) that employee opposed the employer's unlawful employment practices or 2) that employee "made a charge, testified, assisted, or participated in any manner in an investigation , proceeding, or hearing" regarding unlawful employment practices.  42 U.S.C. § 2000e-3(a).  "To establish that an employer has unlawfully retaliated for an employee's having pursued a discrimination action, the employee must show that he was engaged in a protected activity; that the employer was aware of that activity; that there occurred an employment action adverse to the employee; and that there existed a causal connection between the protected activity and the adverse employment action." Hollander v. American Cynamid Co., 895 F.2d 80, 85 (2d Cir. 1990).

In order to survive defendants' motion for summary judgment, plaintiff must first establish that he engaged in protected activity.  When an employee communicates to his or her employer a belief that the employer has engaged in unlawful discrimination, that conduct "virtually always" constitutes conduct for which the employee is entitled to protection under Title VII.  See Crawford v. Metro. Gov. Of Nashville Davidson Cty., TN., 129 S. Ct. 846, 851, 2009 WL 160434, at * 3 (U.S. Jan. 26, 2009).  In this case, plaintiff claims that his various communications with SIAC's human resources department and his supervisors constitute protected activity.  However, plaintiff has produced no evidence showing that he made any specific complaint of discrimination prior to receiving his first written warning.

Moreover, plaintiff concedes that the complaint he communicated to SIAC after his first

warning did not include a racial or national origin discrimination claim. Most of plaintiff's subsequent complaints were similarly devoid of any references to racial discrimination. See Kousoulas Decl., Ex. H (June 7, 2004 email to SIAC's human resources department complaining that this coworker received "a better raise than everybody else" notwithstanding that coworker's "evil talk and behavior"); Ctrstmt. ¶ 68 (Plaintiff admits that his August 16, 2004 response to his Final Written Warning "did not allege he was being retaliated against or discriminated against"); Kousoulas Decl., Ex. S (August 25, 2004 email to SIAC's human resources department stating that he had complained to his supervisors for more than two years about his coworker).

The only communication in the record that expressed plaintiff's belief that he had suffered unlawful discrimination was his August 23, 2004 email to SIAC's human resources department in which he accused his supervisors of discriminatory treatment. See Chinn Decl. Ex. 18 at 1. This communication may satisfy the burden for "protected activity." See Crawford, 129 S. Ct. at 851, 2009 WL 160434, at * 3.

However, plaintiff still must adduce sufficient evidence of a causal connection between this communication and his termination in order to create an inference of discrimination. "The plaintiff can establish the causal connection indirectly by showing that the protected activity was closely followed by [an act of] discrimination or directly by showing evidence of discriminatory animus." Butts v. N.Y.C. Dep't. Of Housing Preservation and Dev., No. 07 civ 1930, 2009 WL 190403, at * 3 (2d Cir. Jan. 28, 2009). If plaintiff establishes such a causal connection, the burden then shifts to defendant to articulate a legitimate, non-discriminatory basis for the adverse employment action. Plaintiff must then produce sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that

more likely than not discrimination was the real reason for the employment action." Woods v. Newburgh Enlarged City Sch. Dist., 288 Fed. Appx. 757, 761 (2d Cir. 2008) (citing Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)); Kiley v. American Soc. for Prevention of Cruelty to Animals, 296 Fed. Appx. 107, 109 (2d Cir. Oct. 2, 2008) (applying preponderance standard to analyze plaintiff's rebuttal of defendant's non-discriminatory motive for termination).

In this action, plaintiff has adduced no evidence showing that his August 23, 2004 email was closely followed by an adverse employment action or overtly discriminatory conduct, nor has he presented evidence of discriminatory animus on the part of his supervisors at Sector. What the record shows is that plaintiff only engaged in protected activity after receiving multiple written warnings for undisputed acts of misconduct. Chinn Decl. Ex. 18. Such facts cannot substantiate a causal connection between plaintiff's August 23, 2004 email to SIAC's human resources department and his January 31, 2005 termination. See Butts, 2009 WL 190403, at * 3.

Furthermore, even if plaintiff had presented evidence of a causal connection between his complaint and termination, defendant has proffered in "clear and specific terms" a non-discriminatory business justification for terminating plaintiff that is "reasonably attributable to an honest ... evaluation of plaintiff's qualifications" and Sector's needs. See Byrnie, 243 F.3d at 102. Consequently, plaintiff must also present evidence showing that defendant's proffered reasons are purely pretextual. See Abdu-Brisson, 239 F.3d at 469.

The record shows that after a major customer discontinued its service arrangement with Sector, Sector's gross revenues and weekend workload declined significantly. See Simone Depo. Tr. 85, 142; Kousoulas Decl., Ex. Z; id. Ex. Y. Apart from plaintiff's unsubstantiated denial that Sector's revenue declined (see Ctrstmt. ¶¶ 85-9), plaintiff has proffered no contradictory evidence

of Sector's earnings. Rather, plaintiff's rebuttal of this evidence consists largely of his own conclusions. See, e.g., Ctrstmt. ¶ 85 ("Plaintiff also disputes that the monitoring of [the major customer's] circuits was a significant component to the work that Sector Tech III's performed"). Furthermore, many of plaintiff's rebuttal statements are contradictory and do not clearly show defendants' non-discriminatory explanation to be false. See, e.g., Ctrstmt. ¶ 97 (plaintiff denies that "Sector has not reinstated the weekend night shift," but admits that Sector's technicians only "cover part of plaintiff's weekend evening shift"); id. at ¶ 94. Most importantly, plaintiff has adduced no evidence to support an inference that the supervisor who decided to eliminate the shift, was motivated by racial animus. Accordingly, plaintiff cannot rebut defendants' legitimate business justification for his termination.

### HOSTILE WORK ENVIRONMENT UNDER TITLE VII

To assert a viable claim that plaintiff endured a hostile work environment, "a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) (internal quotations omitted). This Court will consider "(1) the frequency of the [complained of] conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance" to determine whether a work environment is sufficiently abusive to be actionable under Title VII. See Brennan, 192 F.3d at 319. "Isolated instances of harassment ordinarily do not rise to this level." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir.2000).

Plaintiff has not alleged that while he was employed at Sector, any Sector employee other than plaintiff's one coworker made discriminatory or racist remarks. Plaintiff only demonstrates that this coworker made racially or sexually offensive comments on, at most, a handful of occasions before being, himself, fired for unrelated misconduct. See Ibok Depo. Tr. at 193. Accordingly, plaintiff has failed to demonstrate that he endured frequent and or severely offensive conduct sufficient to substantiate a hostile work environment claim.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED. The Amended Complaint is dismissed in its entirety.

Dated: New York, New York
March 25, 2009

SO ORDERED:

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

-18-